1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMALIER REYES RIVERA,<br><br>                              Petitioner,<br><br>vs.<br><br><br><br>AMY MILLER, Warden, et al.,<br><br>                              Respondents. | CASE NO. 13-cv-2708-H (DHB)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND**<br><br>**(1) DISMISSING ATTORNEY GENERAL AS RESPONDENT;**<br><br>**(2) ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION; AND**<br><br>[Doc. No. 25]<br><br>**(3) DENYING CERTIFICATE OF APPEALABILITY**<br><br>[Doc. No. 31] |

On November 8, 2013, Petitioner Gamalier Reyes Rivera ("Petitioner"), a state prisoner proceeding pro se and in forma pauperis, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) On April 9, 2014, Respondent filed a response to the petition. (Doc. No. 17-1.) On July 23, 2014, Petitioner filed a traverse. (Doc. No. 24.) On October 8, 2014, the magistrate judge issued a report and recommendation ("report") to dismiss Kamala Harris as Respondent, deny the petition for writ of habeas corpus, and deny the request for an evidentiary hearing. (Doc. No. 25.) On December 8, 2014, Petitioner filed objections to the report. (Doc. No. 32.) Also on December 8, 2014, Petitioner filed an application for a certificate of

appealability. (Doc. No. 31.)  After careful consideration, the Court denies the petition for writ of habeas corpus,  adopts the magistrate judge's report and recommendation, dismisses Kamala Harris as Respondent, and denies the application for certificate of appealability.

## **Background**

### I.    **Procedural History**

On January 31, 2011, a jury convicted Petitioner of two counts of attempted first degree murder, two counts of aggravated mayhem, one count of residential burglary. (Lodg. No. 1, vol. 1, part 2 at 189-97.)   The jury also found the enhancements associated with the guilty verdicts to be true.  (Id.)  Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One.  (Lodg. No. 4.)   The state appellate court affirmed Petitioner's convictions in an unpublished written opinion.  (Lodg. No. 7.)  Petitioner then filed a petition for review in the California Supreme Court, which denied the petition without citation of authority. (Lodg. Nos. 8, 9.)

Following that denial, Petitioner filed a petition for writ of habeas corpus in the San Diego Superior Court.  (Lodg. No. 10.)  The superior court denied the petition in an unpublished order.  (Lodg. No. 11.)  Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal, which denied the petition in an unpublished order.  (Lodg. Nos. 12, 13.)  Finally, Petitioner filed a habeas corpus petition in the California Supreme Court, which denied the petition without citation of authority.  (Lodg. Nos. 14, 15.)

On November 8, 2013, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)  In his traverse, Petitioner agrees to the removal of Kamala Harris as a Respondent.  (Doc. No. 24 at 9.)[1]  Petitioner argues his

---

[1]   Page numbers for docketed materials refer to those imprinted by the Court's electronic case filing system.

trial and appellate counsel were ineffective.  (Id. at 19-31.)  Petitioner contends the prosecutor committed misconduct.  (Id. at 32-33.)  He also claims the trial court did not properly instruct the jury.  (Id. at 33-37.)

Respondent argues the state courts' resolution of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Doc. No. 17-1 at 38.)  In addition, Respondent contends the claim regarding jury instructions is procedurally barred.  (Id. at 15-18.)

## II.   Statement of Facts

The Court takes the following facts from the California Court of Appeal's opinion:

Rivera married Erika Von Der Heyde in 2002. They had a daughter and lived together in San Ysidro until they divorced in 2006. They remarried in 2007 and lived together in Imperial Beach, but separated again in December 2008, and began divorce proceedings for a second time. They both started dating other people. However, the divorce was contentious. They argued over custody and support issues. Eventually, Von Der Heyde restricted communication with Rivera through her attorney only.

On or about July 5, 2009, Von Der Heyde, along with her daughter, moved into her boyfriend's home in Escondido. Von Der Heyde decided to move to Escondido from Imperial Beach because she was afraid Rivera was going to take their daughter and flee to Puerto Rico. Von Der Heyde slept in a bedroom with Jesus Vinas, her boyfriend, and her daughter slept in a separate room. Two other couples also lived in the house. One of those couples was Chris Anguiano and Samantha Shaffer, who shared a bedroom in the house as well.

On the night of July 8, 2009, sometime around midnight, Rivera hired a taxi to drive him from Imperial Beach to Escondido, a distance of about 45 to 50 miles. He hired a taxi despite the fact that he owned a vehicle he could have driven that night. He left the vehicle in its parking space at his apartment and called a taxi from a 7–Eleven that was between a half-mile to a mile away from his residence. He left his television on and the front door to his apartment unlocked. Rivera also did not bring his cell phone with him. Although he did not recall why he left it, he did admit the cell phone could have been used to track his position.

After arriving at Vinas's house, Rivera entered it, armed with two hatchets, and walked into a bedroom where Anguiano and Shaffer lay sleeping. A dog in the bedroom started barking, which caused Anguiano to wake up. Anguiano reached across Shaffer to grab his glasses from a window sill. At that moment, Rivera started hitting Anguiano with a hatchet. He hit him first in the chest, causing Anguiano to fall on top of Shaffer who was lying in the bed. Rivera continued his attack on Anguiano, striking his back with a hatchet several times. When Anguiano was finally able to stand up, Rivera struck him in the face

1
2
3

with a hatchet. Anguiano attempted to defend himself, was able to throw Rivera to the ground, but Rivera struck him again in the face with the hatchet. Anguiano eventually passed out on the bedroom floor. At one point during the struggle, Rivera moved toward Shaffer.

4
5
6
7

During the attack, Shaffer was screaming, which woke up Vinas, and he went to her bedroom. He pulled Rivera away from Anguiano and dragged him out of the room. Vinas struggled with Rivera, and Rivera eventually dropped the one hatchet he still possessed (the other hatchet was found in the house, apparently dropped by Rivera earlier). At that point, Rivera fled from the house, but was arrested a short time later at a nearby 7–Eleven.

8
9
10
11
12
13

Anguiano suffered life threatening injuries from the attack, including a deep laceration to his face and one to his lower neck, which cut across the trachea, through the clavicle and down into the deltoid muscle. He also suffered lacerations to his arms and back. Due to his blood loss, Anguiano went into full cardiac arrest about 20 minutes after arriving at a hospital. Anguiano underwent surgery, and remained in a coma for about two months. As a result of his injuries, Anguiano suffers from a host of significant problems. He has a grossly abnormal gait, has problems with balance and coordination, and is blind. He also suffers symptoms of posttraumatic stress disorder (PTSD), including insomnia, depression, nightmares, and flashbacks.

14
15

Shaffer suffered injuries to her thighs, knees and a toe from Rivera's hatchet attack. She has scars on her legs and endures chronic pain in her legs. She is unable to work because she cannot stand for long periods of time and suffers from PTSD.

16

Defense

17
18
19
20
21
22
23

Rivera testified on his own behalf. He admitted entering Vinas's house armed with two hatchets and using the hatchets to inflict the injuries suffered by Anguiano and Shaffer. However, he testified he did not intend to hurt anyone when he entered the house, and he inflicted the injuries only in self-defense after Anguiano attacked him. Rivera explained that his plan was to enter the house and only scare Von Der Heyde with the hatchets. Although he had a service firearm from his job as a border patrol agent, he decided to bring hatchets, not his gun, because he believed hatchets were "the scariest thing." His purported purpose for this plan was to motivate Von Der Heyde to become more cooperative regarding the custody of their daughter. He testified that his plan went awry when the first room he entered happened to be occupied by Anguiano and Shaffer instead of Von Der Heyde.

24
25

People v. Rivera, No. DO59464, 2012 WL 2168806, at *1-2 (Cal. Ct. App. June 14, 2012). (Lodg. No. 7 at 2-5.)

26

/ / /

27

/ / /

28

/ / /

**Discussion**

**I.      Standard of Review**

A federal court may review a petition for writ of habeas corpus by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); accord Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Habeas corpus is an "extraordinary remedy" available only to those "persons whom society has grievously wronged . . . ."  Juan H. v. Allen, 408 F.3d 1262, 1270 (9th Cir. 2005) (quoting Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993)).  Because Petitioner filed this petition after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the petition.  See Lindh v. Murphy, 521 U.S. 320, 327 (1997); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. Federal habeas relief is available only if the result reached by the state court on the merits is "contrary to," or "an unreasonable application" of United States Supreme Court precedent, or if the adjudication is "an unreasonable determination" based on the facts and evidence.  28 U.S.C. §§ 2254(d)(1)-(d)(2).

A federal court may grant habeas relief only if a state court either "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Early v. Packer, 537 U.S. 3, 8 (2002); see also Williams, 529 U.S. at 405-06 (distinguishing the "contrary to" and the "unreasonable application" standards).  "[R]eview under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).  "Although the Supreme Court has declined to decide whether a

1   district court 'may ever choose to hold an evidentiary hearing before it determines that
2   § 2254(d) has been satisfied,' an evidentiary hearing is pointless once the district court
3   has determined that § 2254(d) precludes habeas relief."   Sully v. Ayers, 725 F.3d
4   1057, 1075 (9th Cir. 2013) (citing Pinholster, 131 S.Ct. at 1411 n. 20).

5          A federal court may grant habeas relief under the "unreasonable application"
6   clause of § 2254(d)(1) if the state court "identifies the correct governing legal rule from
7   [the Supreme] Court's cases but unreasonably applies it to the facts of the particular
8   state prisoner's case." Williams, 529 U.S. at 407.   A federal court may also grant
9   habeas relief "if the state court either unreasonably extends a legal principle from
10  [Supreme Court] precedent to a new context where it should not apply or unreasonably
11  refuses to extend that principle to a new context where it should apply." Id.  The state
12  court's "unreasonable application" of binding precedent must be objectively
13  unreasonable to the extent that the state court decision is more than merely incorrect
14  or erroneous. Wiggins v. Smith, 539 U.S. 510, 520–21 (2003) (citation omitted); see
15  also Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003).

16         Additionally, even if a state court decision is "contrary to" United States
17  Supreme Court precedent or rests on an "unreasonable determination" of facts in light
18  of the evidence, the petitioner must show that such error caused substantial or injurious
19  prejudice. Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht, 507 U.S. at
20  637-38); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007); Bains v. Cambra, 204 F.3d
21  964, 977 (9th Cir. 2000).  AEDPA creates a highly deferential standard toward state
22  court rulings. Woodford v. Viscotti, 537 U.S. 19, 24 (2002); see Womack v. Del Papa,
23  497 F.3d 998, 1001 (9th Cir. 2007) (citing Woodford, 537 U.S. 19 (2002)).

24         In determining whether a state court decision is contrary to clearly established
25  federal law, the court looks to the state's last reasoned decision. Avila v. Galaza, 297
26  F.3d 911, 918 (9th Cir. 2002).  Where there is an unexplained decision from the state's
27  highest court, the court "looks through" to the last reasoned state judgment and
28  presumes that the unexplained opinion rests upon the same ground.   Ylst v.

1   Nunnemaker, 501 U.S. 797, 801-06 (1991).

2       A district court "may accept, reject, or modify, in whole or in part, the findings
3   or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects
4   to any portion of the magistrate's report, the district court reviews de novo those
5   portions of the report. Id.

6   **II.    Analysis**

7       **A. Ineffective Assistance of Trial Counsel Claim**

8       Petitioner asserts trial counsel was ineffective. Respondent contends the state
9   court's resolution of these claims was neither contrary to, nor an unreasonable
10  application of, clearly established United States Supreme Court law. (Doc. No. 17-1
11  at 18-26.)

12      The Sixth Amendment guarantees a criminal defendant the right to effective
13  assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86 (1984). To
14  establish ineffective assistance of counsel, a petitioner must first show his attorney's
15  representation fell below an objective standard of reasonableness. Id. at 688. He must
16  also show the errors caused him prejudice. Id. at 694. To establish prejudice under
17  Strickland, a petitioner must demonstrate that the attorney's error rendered the result
18  unreliable or the trial fundamentally unfair. Id.; see also Fretwell v. Lockhart, 506 U.S.
19  364, 372 (1993).

20      "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky,
21  559 U.S. 356, 372 (2010). In evaluating whether counsel's performance was deficient,
22  "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland,
23  466 U.S. at 689. There is a "strong presumption that counsel's performance falls
24  within a wide range of reasonable professional assistance." Id. The court need not
25  address both the deficiency prong and the prejudice prong if the defendant fails to make
26  a sufficient showing of either one. Id. at 697.

27      Petitioner first raised his ineffective assistance of trial counsel claims in the
28  habeas corpus petition he filed in the San Diego Superior Court. (Lodg. No. 10.) The

superior court denied the claims, stating the claims "could have been addressed on appeal." (Lodg. No. 11 at 2.)  The court also addressed the merits, stating that "given the great weight of the evidence, Petitioner has failed to show a reasonable probability that the result of the proceedings would have been different." (Id.)  Petitioner raised the same claims in the petition he filed in the California Court of Appeal.  (Lodg. No. 12.)  The appellate court denied the petition, holding that the claims were procedurally barred because Petitioner could have raised the claims on direct appeal.  Finally, Petitioner raised his claims in the California Supreme Court, which denied the petition without citation of authority.  (Lodg. Nos. 14, 15.)

Because the California Supreme Court denied the petition in an unexplained opinion, this Court "look[s] through" to the last reasoned state opinion.  See Ylst, 501 U.S. at 806.  The appellate court's "reliance on the relitigation rule does not amount to a ruling on the merits or a denial on procedural grounds . . . ."  Pirtle v. Morgan, 313 F.3d 1060, 1168 (9th Cir. 2005) (citing Ylst, 501 U.S. at 805-06) (holding that "when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo").  It is not clear whether this Court should look to the appellate court's opinion, which is reviewed de novo, Pirtle, 313 F.3d at 1167, or to the superior court's analysis on the merits, which calls for deferential review, Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  The Court need not decide this issue because Petitioner's claims fail even under the more liberal Pirtle standard.

Petitioner contends his trial counsel was ineffective.  But in light of the facts of the case, counsel made a reasonable tactical decision to focus on disproving the intent elements of attempted murder, torture, and mayhem in the evidence and in closing argument.  Counsel's statements were reasonable, tactical decisions in the context of his argument as a whole.  See Richter, 131 S. Ct. at 788.  Counsel was at least partially successful, because the jury acquitted Petitioner of the torture counts.

Petitioner must also show the errors caused prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  Petitioner has not established prejudice.  Petitioner admitted he went to Vinas's house armed with two hatchets. (Lodg. No. 3, vol. 5 at 296-98.)  When traveling to Vinas's house, Petitioner made efforts to cover his tracks.  (<u>Id.</u> at 299.)  Petitioner called a taxi from a 7-Eleven up to a mile away from his house.  (<u>Id.</u>)  This enabled him to leave his car at his residence, making it appear he was at home at the time of the crime.  (<u>Id.</u> at 335.)  In addition, he left his house unlocked, the television on, and his cell phone at home in a further effort to establish an alibi.  (<u>Id.</u> at 333-35.)  When he arrived in Escondido, he had the taxi driver drop him off several blocks away from Vinas's house.  (<u>Id.</u> at 300.)  The jury had an opportunity to consider and reject Petitioner's testimony that he only intended to frighten Von Der Heyde regarding a custody dispute about their daughter.

In addition, the jury heard evidence that Von Der Heyde discovered a list written by Petitioner while they were married.  The list read as follows:

Getting Rid of the Wasted

1.  Tools, gloves, bag big and dark, zip ties, weights, boots, bag for boots and gloves

2.  4/17/05 Surveillance on area.  (Late hours).  Find a spot for vehicle away from road view.  Learn best route from vehicle to mint.

3.  Snap it, rope it, bag it, dump it.  Leave no prints.

4.  Throw away gloves and boots separately.  Wash vehicle and vacuum.  (Not in station).

5.  In the morning: Daycare while calling Keila, Nelly (mad) where is she?

* Bag her purse & cell phone, clothes (make it look like she walked out).  Call my cell phone.  (Help).  (No answer).

6. (Work Time).  Go to work explain situation.  (Try to work).  Make frequent calls to Erika.

7.  Next day, emergency family leave.  Ask for advice.  (Don't know)

* Throw away receipts for bag and weights.

(Lodg. No. 3, vol. 4 at 125-27; vol. 5 at 324; Lodg. No. 7 at 6-7.)

Von Der Heyde and her brother both believed the list was Petitioner's plan to kill

1  her.  (Lodg. No. 3, vol. 4 at 125.)  Both Von Der Heyde and her brother called the
2  police about the list.  (Id.)  The jury could conclude that the list was additional
3  evidence of Petitioner's intent toward Von Der Heyde.  The jury could reasonably
4  reject Petitioner's claim that he only intended to frighten Von Der Heyde when he
5  broke into Vinas's house in the middle of the night armed with two hatchets.  In sum,
6  Petitioner has not established trial counsel undermined his defense because he has not
7  satisfied either prong of the Strickland test.  Accordingly, he is not entitled to relief on
8  this claim.

9       Petitioner next contends trial counsel was ineffective for failing to adequately
10  cross examine Anguiano and Shaffer about inconsistencies between statements they
11  made to investigators before trial and their testimony at trial.  (Doc. No. 1 at 8-11; Doc.
12  No. 24 at 30-31.)  Petitioner additionally complains that his trial counsel did not point
13  out discrepancies in the victims' testimony.  Vigorously cross examining a severely and
14  permanently injured victim over minor discrepancies in his memory of the incident
15  would not have helped Petitioner.[2]

16       Petitioner also faults counsel for failing to adequately cross examine Shaffer, the
17  other victim, about her description of the attack.  (Doc. No. 1 at 10-11; Doc. No. 24 at
18  27-30.)  But Petitioner does not explain how cross examining Shaffer about these
19  issues would have altered the outcome of the trial.  See Strickland, 466 U.S. at 694.

20

21       [2] The state appellate court described Anguiano's injuries as follows:

22            "Anguiano suffered life threatening injuries from the attack,
23       including a deep laceration to his face and one to his lower neck, which
         cut across the trachea, through the clavicle and down into the deltoid
24       muscle.  He also suffered lacerations to his arms and back.  Due to his
         blood loss, Anguiano went into full cardiac arrest about 20 minutes after
25       arriving at a hospital.  Anguiano underwent surgery, and remained in a
         coma for about two months.  As a result of his injuries, Anguiano suffers
26       from a host of significant problems.  He has a grossly abnormal gait, has
         problems with balance and coordination, and is blind.  He also suffers
27       symptoms of posttraumatic stress disorder (PTSD), including insomnia,
         depression, nightmares, and flashbacks."

28  (Lodg. No. 7 at 2.)

1   Moreover, Petitioner has not established that any such failure caused prejudice because
2   the evidence of his guilt was overwhelming.  Accordingly, he is not entitled to relief
3   on this claim.

4        Petitioner next faults his trial counsel for failing to request CALCRIM 3404 on
5   the defense of accident or misfortune and CALCRIM 3470 on self defense.  (Doc. No.
6   1 at 11; Doc. No. 24 at 31.)  "[T]he claim that a [crime] was committed through
7   misfortune or accident amounts to a claim that the defendant acted without forming the
8   mental state necessary to make his or her actions a crime."  People v. Jennings, 50 Cal.
9   4th 616, 674 (2010) (quotations omitted).  The Court agrees with the trial judge that the
10  defense of accident did not apply.  See People v. Szadziewicz, 161 Cal. App. 4th 823
11  (2008) As a result, Petitioner has not established prejudice.  See Strickland, 466 U.S.
12  at 694.  The trial court properly instructed the jury that to find Petitioner guilty of the
13  attack on Shaffer, they had to conclude, beyond a reasonable doubt, that he acted with
14  the requisite intent.  (See Lodg. No. 1 at 176-80.)  The jury's guilty verdicts on the
15  aggravated mayhem and assault with a deadly weapon charges indicate that they found
16  he had the requisite intent.  Thus, even if counsel had asked for the accident instruction
17  and the trial court agreed to give it, the result of the proceedings would not have been
18  different.  See Strickland, 466 U.S. at 694.

19       Petitioner also faults counsel for failing to request self defense jury instructions.
20  (Doc. No. 1 at 11; Doc. No. 24 at 31.)  The trial judge cited a case to counsel and stated
21  that "based on that case, just for the record, if you were requesting self defense, based
22  on the facts that I know, I would not be giving self defense instructions."[3]  (Lodg. No.
23  3, vol. 6 at 370.)   Given the trial judge's statement, counsel was reasonable in
24  refraining from arguing with the judge about the applicability of self defense
25  instructions to Petitioner's case.  See Strickland, 466 U.S. at 687.

26       "[A] defendant who–through his own wrongful conduct, such as initiating a

27

28        _____

          [3]  The trial judge cited People v. Szadziewicz, 161 Cal. App. 4th 823 (2008).

physical assault of committing a felony–has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke unreasonable self defense." <u>Szadziewicz</u>, 161 Cal. App. 4th at 834 (internal citations omitted). Moreover, Petitioner has not shown that even if the trial court agreed to give the specific jury instructions on self defense the result of the proceedings would have been different. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. For the foregoing reasons, Petitioner has failed to establish either that counsel committed errors or that counsel's errors prejudiced him. <u>See</u> <u>id.</u> Accordingly, he is not entitled to relief on these claims.

Petitioner also contends counsel should have objected to alleged misconduct by the prosecutor during closing argument. Specifically, Petitioner claims the prosecutor told the jury Petitioner only stopped assaulting Anguiano and Shaffer with the hatchets because "others intervened to stop the attack." (Doc. No. 1 at 11; Doc. No. 24 at 31.) The prosecutor properly argued reasonable inferences from the testimony. Thus, trial counsel was not ineffective for failing to object to the prosecutor's statements. <u>See</u> <u>Strickland</u>, 466 U.S. at 687. Accordingly, Petitioner is not entitled to relief on this claim.

## B. Ineffective Assistance of Appellate Counsel Claim

Petitioner also argues his appellate counsel was ineffective. Petitioner contends his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective. (Doc. No. 1 at 6-7; Doc. No. 24 at 19-22, 26-27.) The <u>Strickland</u> test applies to ineffective assistance of appellate counsel claims. <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). Petitioner must first show that his appellate counsel's performance fell below an objective standard of reasonableness. <u>Strickland</u>, 466 U.S. at 688. He must also establish counsel's errors prejudiced him. <u>Id.</u> at 694. To establish prejudice, Petitioner must demonstrate that he would have prevailed on appeal absent counsel's errors. <u>Smith</u>, 528 U.S. at 285. Appellate counsel is not required to raise frivolous or meritless claims on appeal. <u>Jones v. Ryan</u>, 691 F.3d 1093, 1101 (9th Cir. 2012). None of the instances of trial counsel's performance cited by Petitioner

amount to ineffective assistance of counsel. Thus, appellate counsel was not ineffective for failing to raise them on appeal. See id.

### C. Prosecutorial Misconduct Claim

Petitioner contends the prosecutor committed misconduct. (Doc. No. 1 at 12; Doc. No. 24 at 32-33.) Specifically, Petitioner contends the prosecutor falsely argued that a third party named Vinas intervened and stopped Petitioner's attack on Anguiano. (Id.) Petitioner contends that Vinas never testified he saw Petitioner attacking Anguiano, only that there was a struggle, and that Petitioner stopped on his own free will once the bedroom light came on. (Id.)

A prosecutor may argue reasonable inferences drawn from the evidence presented at the trial. Darden v. Wainwright, 477 U.S. 168, 181-82 (1986). Moreover, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Id. at 181. Rather, a prosecutor commits misconduct when his or her actions "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

The prosecutor's argument accurately reflected Vinas's testimony. Vinas testified that he saw two men struggling and he forced Petitioner to drop the weapon after pulling him out of the room. (Lodg. No. 3, vol. 5 at 239, 242-44.) Thus, the prosecutor's arguments that Vinas "intervene[d] to stop the attack" were reasonable. (Lodg. No. 3, vol. 6 at 404.) As a result, there was no prosecutorial misconduct, and Petitioner is not entitled to relief on this claim.

### D. Jury Instruction Error Claim

Finally, Petitioner contends the trial court erred by failing to instruct the jury on the defense of accident (CALCRIM 3404) and self defense (CALCRIM 3470). (Doc. No. 1 at 14.) Respondent argues that the claim is procedurally defaulted and that the facts of the case do not warrant either instruction. (Doc. No. 17-1 at 28-34.)

Generally, "a defendant is entitled to an instruction as to any recognized defense

for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988) (citing Stevenson v. United States, 162 U.S. 313 (1896)).  When determining whether error occurred, the Court examines whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 636-38; Bains v. Cambra, 204 F.3d 964, 971 n.2 (9th Cir. 2000).   The error is harmless unless Petitioner can establish "actual prejudice." Brecht, 507 U.S. at 637.  The Court looks to the overall instructions given to the jury. Boyde v. California, 494 U.S. 370, 378 (1990) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

Petitioner is not entitled to relief on his claim that the trial court should have instructed the jury on the defense of accident.  The California Supreme Court has stated that "assuming the jury received complete and accurate instructions on the requisite mental element of the offense, the obligation of the trial court in each case to instruct on accident extend[s] no further than to provide an appropriate pinpoint instruction upon request by the defense." People v. Anderson, 51 Cal. 4th 989, 998 (2011).  In Petitioner's case, the jury was properly instructed that to convict him of assault with a deadly weapon, they had to find, beyond a reasonable doubt, that he intentionally "did an act with a deadly weapon . . . that by its nature would directly and probably result in the application of force to a person," and that he did the act willfully.  (Lodg. No. 1, vol. 1, part 2 at 163, 178-80.)

Petitioner was also not entitled to self defense instructions given the facts of his case.  The California Supreme Court has refused to apply the doctrine of imperfect self defense in cases where a defendant's "own wrongful conduct (for example, a physical assault or commission of a felony) created the circumstances in which the adversary's attack is legally justified." People v. Booker, 51 Cal. 4th 141, 182 (2011) (internal citations omitted).  Petitioner's wrongful conduct of carrying two hatchets into a darkened bedroom inside Vinas's house to scare Von Der Heyde "created the circumstances in which [Anguiano's] attack [was] legally justified." Id.

1   For the foregoing reasons, the denial of these claims was neither contrary to, nor

2   an unreasonable application of, clearly established Supreme Court law.[4]  Accordingly,

3   Petitioner is not entitled to relief as to these claims.

4   **E.  Request for an Evidentiary Hearing**

5   Petitioner asks the Court to conduct an evidentiary hearing on his claims.  (Doc.

6   No. 24 at 37.)  Petitioner can only develop additional evidence in federal court if he

7   satisfies section 2254(d).  Sully, 725 F.3d at 1075-76 ("[A]n evidentiary hearing is

8   pointless once the district court has determined that § 2254(d) precludes habeas

9   relief.") (citing Pinholster, 131 S. Ct. at 1398).  Petitioner has not shown that he is

10  entitled to relief under section 2254(d).  Accordingly, the Court denies the  request for

11  an evidentiary hearing.  See Pinholster, 131 S. Ct. at 1398; see also Sully, 725 F.3d at

12  1075-76.

13  **Conclusion**

14  For the foregoing reasons, the Court denies the petition for habeas corpus,

15  adopts the magistrate judge's report and recommendation, and dismisses Kamala Harris

16  as Respondent.  Additionally, the Court declines to issue a certificate of appealablity

17  as Petitioner has failed to make a substantial showing of the denial of a constitutional

18  right.  28 U.S.C. § 2253(c)(2).

19  **IT IS SO ORDERED.**

20  DATED: January 6, 2015

21

22  MARILYN L. HUFF, District Judge
    UNITED STATES DISTRICT COURT

23

24

25

---

26  [4] As the instructional claim fails on the merits, the Court need not reach respondent's argument of procedural default.  Batchelor v. Cupp, 693 F.2d 859, 864

27  (9th Cir. 1982) (noting that where deciding the merits of a claim proves to be less complicated and less time consuming than adjudicating the issue of procedural default,

28  a court may exercise discretion in its management of the case to reject the claims on their merits).